UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| THE ESTATE OF TERRY GEE, JR., | ) | |
| Deceased, by Special Administrator, | ) | |
| VERA GEE, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:06-cv-94-WTL-TAB |
| | ) | |
| MONROE COUNTY SHERIFF Stephen Sharp, | ) | |
| BLOOMINGTON HOSPITAL AND HEALTH | ) | |
| CARE SYSTEM, INC., | ) | |
| WYGONDA ROGERS, | ) | |
| JAIL COMMANDER BILL WILSON, | ) | |
| CPT. JOHNSON, SGT. EDWARDS, | ) | |
| JENNIFER ANDERSON, LPN, | ) | |
| TRINA ESTES, LPN, GWEN SUNKEL, LPN, | ) | |
| Jointly and severally , | ) | |
| Defendants. | ) | |

**ORDER**

Plaintiff, the Estate of Terry Gee, Jr. ("the Estate"), filed this action following the death on

April 5, 2005, of Terry Gee, Jr. ("Gee"), apparently from "progressive respiratory failure related to

adult respiratory distress syndrome and perhaps fluid overload from renal failure."  Tennessen

Prelim. Report at p. 5.[1]  Gee, an insulin-dependent diabetic, was held in custody at the Monroe

County Jail from March 18, 2005, through March 31, 2005, where he developed pneumonia and was

subsequently transported to the hospital for emergency treatment.  The Estate seeks relief under 42

U.S.C. §§ 1983 and 1988 and under state law.

---

[1] Gee's mother, Vera Gee, initiated this action as the Special Administrator of Gee's
estate.  As the Jail Defendants note in their reply brief, Ms. Gee has been withdrawn as the
administrator and replaced by Thomas Beeman.  *See* Jail Defs.' Reply Br. at 34; Oct. 14, 2008,
Order of the Monroe Circuit Court.  Therefore, the Clerk is **DIRECTED** to substitute Thomas
Beeman for Vera Gee in the caption and remove Ms. Gee's name.

This cause is now before the Court on two separate motions for summary judgment. The first motion was filed by the Jail Defendants, *i.e.*, the Monroe County Sheriff ("Sheriff"), Jail Commander Bill Wilson ("Commander Wilson"), Captain Johnson, and Sergeant Edwards (Docket No. 129).[2] The second motion was filed by the Medical Defendants, *i.e.*, Bloomington Hospital and Health Care System, Inc. ("Hospital"), Wygonda Rogers ("Rogers"), Jennifer Anderson ("Anderson"), Trina Estes ("Estes"), and Gwen Sunkel ("Sunkel") (Docket No. 135). In addition, the Estate, has filed a motion for oral argument on this matter (Docket No. 165). Finally, the Jail Defendants have filed a motion to strike evidence submitted by the Estate with its surreply brief (Docket No. 201). The Medical Defendants have joined in that motion. Each of these motions has been fully briefed and is ripe for ruling.

Because the parties' briefs adequately inform the Court of the issues, the Court concludes that oral arguments is unnecessary. Therefore, the Estate's motion for oral argument is **DENIED**. In addition, as more fully explained herein, the Defendants' motion to strike is **GRANTED**, the Jail Defendants' motion for summary judgment is **GRANTED in part and DENIED in part**, and the Medical Defendants' motion for summary judgment is **DENIED**.

## I. <u>PRELIMINARY EVIDENTIARY MATTERS</u>

Defendants have moved to strike the affidavit of Jason Hochman that was submitted with the Estate's surreply brief to counter the arguments made regarding Captain Johnson. Defendants argue that the submission was in violation of Local Rule 56.1(d) because they did not refer to any

---

[2] Stephen Sharp is no longer the Monroe County Sheriff. Therefore, pursuant to Federal Rule of Civil Procedure 25(d), the proper party is his successor.

new evidence in their reply briefs.  This Court permits evidence to be submitted with surreplies in limited circumstances where such evidence "responds to the moving party's new evidence."  *Lloyd v. Rolls Royce Corp.*, No. IP 01-1775-CHK, 2003 WL 23101791, *3 (S.D. Ind. Aug. 26, 2003). Improper surreply submissions are stricken by this Court.  *See id.*

The Court agrees with Defendants that there is no reason justifying the Estate's failure to submit the affidavit with its response in opposition to the motions for summary judgment. Defendants did not offer any new evidence in their reply briefs related to Captain Johnson. Therefore, the Court **GRANTS** the request to strike Hochman's affidavit and will not consider it. In doing so, however, the Court pauses to note that much of the information in the affidavit is simply duplicative of other evidence before the Court.

In addition, Defendants have requested in their reply briefs that the Court strike inadmissible conclusions and opinions of the Estate's tendered experts.  Defendants argue that some of the statements of these witnesses are inadmissible legal conclusions or are based on nothing more than speculation.  In addition, Defendants contend that the experts' declarations, submitted after the case management plan's deadline for expert reports, should be stricken in their entirety.

The Court agrees that any legal conclusion or unsupported opinion should be stricken and therefore **GRANTS** the request to strike those portions of the experts' reports and statements that contain such information.  However, the Court declines to strike any "late" expert submissions. Based on the arguments, the Court concludes that Defendants are not prejudiced by any presumed violation of Federal Rule of Civil Procedure 26(a)(2).  Specifically, it appears that the supplemental materials were submitted shortly after the depositions had concluded and the experts had the opportunity to review all of the evidence in this case.  Therefore, any violation was harmless.  *See*

*Sherrod v. Lingle*, 223 F.3d 605, 612-13 (7th Cir. 2000).  Accordingly, the request to completely strike the supplemental expert materials is **DENIED**.

## II.  <u>BACKGROUND</u>[3]

### A.  THE MONROE COUNTY JAIL'S ARRANGEMENTS FOR MEDICAL SERVICES

Prior to Gee's death, the Sheriff and the Hospital entered into an agreement whereby the Hospital would provide medical service to the inmates at the Monroe County Jail.  The agreement required the Hospital to provide a jail doctor, an adult nurse practitioner, and four license practical nurses ("LPNs") who would provide medical services seven days a week.  At the time of Gee's detention at the jail, the jail doctor was Dr. Tim Alward ("Dr. Alward") and Rogers was the nurse practitioner.  Anderson, Estes, and Sunkel were three of the LPNs.

Under the agreement, Rogers and the LPNs were expected to work at least forty hours per week and the Hospital was expected to provide the jail emergency coverage through the emergency department.  Rogers generally worked from 7:00 a.m. to 5:00 p.m. each weekday.  The LPNs worked two shifts, one from 4:00 a.m. to approximately 2:00 p.m., and one from 2:00 p.m. to 10:30 or 11:00 p.m., seven days a week.  After 11:00 p.m., none of the nurses was scheduled to work; however, some of the jail officers who worked the night shift were trained EMTs.

---

[3]  The Estate makes a number of statements in its responses without providing any citation to evidentiary support.  The Court will not scour the record to attempt to find evidentiary support for such Estate's assertions.  In addition, the Court has ignored those assertions made by the Estate that are not truly facts but instead are the Estate's opinions or legal conclusions, or are statements or opinions incorrectly attributed to a witness who did not make the statement or opinion.

In addition to the nursing staff, Dr. Alward was available to attend to the medical needs of the inmates.  Under the agreement, he was expected to review five percent of patient records each week, to supervise the delivery of medical services at the jail, and to spend a minimum of five hours at the jail each week. He was also on call to consult on individual cases with the adult nurse practitioner or with the LPNs.  Further, Dr. Alward had the ability to designate another doctor to oversee his duties if he would be unavailable.  Unfortunately, Dr. Alward did not make his normal visit to the jail during Gee's last week at the jail because he planned to be out the country, and he did not designate another doctor to oversee his duties while he was away.

Finally, besides the medical staff, jail officers at the jail were required to undergo and successfully complete the 40-hour jail officer training course offered through Indiana Law Enforcement Academy.  At the time of Gee's detention, jail officers were also required to undergo a 40-hour in-house training and orientation program at the jail after they were hired.  The program consisted of three days of classes and two days of hands-on training in the jail blocks.  One of the classes involved medical considerations for inmates.

## B.  GEE'S CONFINEMENT AND TREATMENT

Gee was booked into the Monroe County Jail on March 18, 2005, following his arrest for a theft charge.  Gee had been in the jail on other occasions and was known to be a severe diabetic and a schizophrenic.  The booking officer, aware of Gee's condition, initially placed him in the detox area so that Gee could be observed periodically and issues regarding Gee's diabetes could be noticed before they "bottomed out."  When Gee arrived at the jail, Gee had no medications on him but stated that he was taking Xanax and other drugs.

Throughout Gee's stay at the jail, the medical staff attempted to administer insulin twice a day, although Gee sometimes refused it, and they checked his blood sugar level twice a day.  In addition, they administered the various medications and psychotropic drugs that Gee was taking. Gee had contact with a nurse at least twice a day and as many as four times a day while in the jail. His first contact of significance was on March 19, 2005.  On that date, Rogers ordered that Gee be placed on a diabetic diet, administered insulin, and have his blood sugar level checked twice a day. In addition, Anderson saw Gee that day and took his blood sugar readings, which ranged from 325 at 3:45 a.m. to 37 at 8:40 a.m.  At 10:10 a.m., after Gee was provided with peanut butter sandwiches and Kool Aid, his blood sugar level was rechecked again and measured 85.

In the meantime, the nursing staff contacted Gee's mother to obtain information about the medications that Gee was taking.  Gee's mother subsequently brought Gee's medicine to the jail on March 20, 2005, but Xanax was not among those drugs that she brought.

On March 26, 2005, Mark Estanislau ("Estanislau") became Gee's cellmate.  Estanislau has indicated that Gee did not look real sick at that time but did complain about not feeling well. According to Estanislau, Gee stated that he did not want Estanislau to catch what was ailing Gee. In addition, Estanislau asserts that he and Gee conversed a lot during their first couple of days as cellmates.  He also noted that Gee refused to his food because he did not feel well and was in pain. After those first couple of days, however, Estanislau believed that Gee's condition began rapidly declining.  Estanislau started holding back food from the meal trays for Gee to eat.  He noted that Gee was failing out of his bed, pacing in circles, and complaining of severe back pain.  Estanislau contends that Gee indicated that he was trying to get his mother and girlfriend to contact the jail and convince the staff to send him to the hospital.  Moreover, Estanislau states that he and other inmates

repeatedly told jail officers, including Captain Johnson, and the medical staff about Gee's condition and that Gee needed to go to the hospital for medical treatment. Estanislau's concerns were echoed by another individual, Lloyd Turpin ("Turpin"), who visited Gee during Gee's stay at the jail.

After Estanislau became his cellmate, Gee saw Rogers in the medical unit on March 28, 2005, at 2:30 p.m. This was the first time that Gee sought medical attention from Rogers. At that time, he was coughing, had a sore throat, and had a temperature of 100.3. He reported that his symptoms had started seven days prior to that time. Rogers prescribed Benadryl, Robitussin, and Tylenol. Rogers concluded that Gee was exhibiting flu-like symptoms and expected his symptoms to clear within seven days.

 At approximately 4:30 a.m. the next day, Anderson saw Gee during breakfast medication pass. At that time, she checked his blood sugar level. In addition, Anderson noticed that Gee was stepping back and forth, swaying, and was unsteady on his feet. She thought that he appeared to be dizzy. As Andeson was checking Gee's blood sugar, Gee's knees began to buckle and he started to fall to the floor. Anderson managed to assist Gee back to his bunk and, because he felt warm, she took his temperature, which was 103.7 degrees. In addition, Gee's heart rate was high and his respirations were recorded as being 30. Anderson, concerned about the high temperature and instability in controlling Gee's diabetes, notified Rogers of Gee's condition at 4:45 a.m. Rogers instructed Anderson to give Gee Tylenol, which subsequently lowered Gee's temperature to 100.8. However, Gee's blood sugar was 327 and remained an issue, although Anderson concluded that it was probably because Gee and not eaten anything and had refused breakfast.

Subsequently, at 10:55 a.m. that morning, Rogers saw Gee and concluded that he still had the flu. At that time, Gee complained about back pain and a sore throat and said that his back hurt

because of coughing.  Anderson claims that Gee also reported that the Robitussin was helping and that he was eating and drinking.  Rogers checked Gee's breath sounds and took his temperature, which was 100.2.  She then ordered Tylenol, Hydrocodone, Fuaifenesin, and rest and fluid intake to treat Gee's symptoms and stopped the Robitussin.  Finally, sometime during that day or the next day, she spoke with Gee's mother who complained about Gee's high temperature and blood sugar levels and expressed concern that Gee needed to go to the hospital.  Rogers responded by telling Gee's mother that she was treating Gee's symptoms.

At 4:00 a.m. on March 30, Anderson once again saw Gee.  She took his blood sugar and noted that it was 241, which she states was acceptable for Gee.  She also gave Gee his medications.  According to Anderson, when her shift ended that day she believed that Gee had the flu and reported the same to Estes, who took over Gee's treatment at that time.

During medication pass that evening, Estes spoke with Gee and told him that he needed to take his medication, get rest, and make sure that he ate and drank plenty of fluids.  She also told Gee to let staff know if he had any problems.  She then measured Gee's respirations, which were short and rapid and  checked Gee's blood sugar.  She noted that it had been 342 the day before and was now elevated to 588, which was high even for Gee.  Based on the blood sugar level, Estes decided to contact Rogers, who had already left for the day.  Estes thought that Rogers would send Gee to the hospital at that time.  However, Rogers informed Estes that she had been actively treating Gee and was familiar with his condition.  When Estes described Gee's symptoms, Rogers concluded that Gee had a bacterial infection and ordered Keflex, an antibiotic.  Rogers also instructed Estes to check Gee's blood sugar level again at the 9:30 p.m. medication pass and that if it exceeded 250 to

8

give Gee a double dose of insulin.  Finally, Rogers told Estes that she would check on Gee the next morning.

Thereafter, around 9:30 p.m., Estes did another medication pass.   Other inmates, including Estanislau, reported stated that Gee had not eaten for the last several days and had passed out that morning from being so weak.  Therefore, when Gee came to the medication cart, Estes told him to make sure he ate, took adequate fluids, and took his insulin.  Further, at that time she checked Gee's blood sugar level again, which had dropped to 432 but was still high.  Pursuant to Rogers's orders, Estes gave Gee a double dose of insulin, which further dropped the level to 300 sometime the next day.  Estes also gave Gee a double dose of Keflex at that time.

Estes then summoned Captain Johnson and expressed her concern that Gee be placed in medical segregation for medical observation.  Estes told Captain Johnson that Gee had an infection.  In addition, Captain Johnson admits that she overheard inmates saying that Gee was sick and had not been eating.  She also asserts that the inmates expressed concern that Gee had the flu and that they did not want to catch it.  However, she apparently disputes Estanislau's statement that he and other inmates indicated that Gee needed to be taken to the hospital.  In any event, Caption Johnson approved the transfer to segregation.  Estes prepared a shift memo for distribution, which stated that "due to unstable diabetic condition, fever, not eating, poor fluid intake, patient should be placed in medical segregation for close observation."  Because Gee was too weak to sign the paperwork or walk, Captain Johnson had Gee wheeled to the segregation cell and ordered that a pitcher of water be placed in the cell with Gee.  She also signed off on a medical segregation order which indicated that Gee had an extremely high blood sugar level and had been sick with a respiratory condition.

After Gee was placed in the segregation cell, he was observed multiple times by either Estes or jail officers.  The jail officers were able to monitor the cell via video surveillance and recorded their observations on a log.  Estes and the jail officers noted that Gee was lying down and appeared to be resting.  During her checks, Estes did not see any problems with breathing.  When her shift ended and she left at 11:34 p.m., Estes did not expect that Gee's condition would further deteriorate.

Gee was not seen again by medical staff until 4:24 a.m. on March 31, 2005, when he was given his morning dose of medications and a food try by Sunkel.  Sunkel also persuaded Gee to drink half of a glass of milk.  Gee was pale and ashy in appearance and seemed tired and weak.  However, like the other nurses, she thought at the time that Gee had the flu.  When she checked on Gee around 6:00 a.m., he was sleeping in a corner and had not eaten any of his food.  At that time, Sunkel gave Gee additional medications, including Keflex, and noted that Gee was responsive to verbal commands.

Rogers arrived later that morning and checked on Gee at 7:15 a.m.  At that time, Gee was dusky and kind of gray in color, which Rogers concluded was a sign of respiratory involvement.  Rogers believed that Gee had developed a case of pneumonia.  While she was examining Gee, Sergeant Edwards was outside of the cell for security purposes and observed that a pitcher of water had been placed in Gee's cell per Captain Johnson's instructions.   When she finished her examination,  Rogers told Sergeant Edwards that Gee needed to be taken to the hospital for pneumonia observation.  She did not indicate that Gee needed emergent care or that Sergeant Edwards should call for ambulance.  Therefore, Sergeant Edwards made arrangements for another officer, who was scheduled to do transports that day, to take Gee to the hospital.  Sergeant Edwards estimates that he made the request at approximately 7:30 a.m.

10

When the officer arrived to take Gee to the hospital, Gee was disoriented and had to be wheeled to a waiting minivan. The officer left the jail at approximately 8:04 a.m. and arrived shortly thereafter around 8:08 a.m. He immediately went into the emergency room to summon personnel and when he returned to the minivan a minute later Gee was no longer breathing. Gee was loaded onto a stretcher and taken into the emergency room. Doctors advised that Gee had a severe case of pneumonia, that his kidneys were not working properly, and that he was in critical condition. Gee subsequently died at the hospital on April 5, 2005.

Thereafter, several individuals designated as experts reviewed Gee's treatment records and concluded that Gee's symptoms revealed that he needed obvious medial attention and should have been transported to the hospital sooner. These experts have also opined that Gee received inadequate medical care at the jail. Even Dr. Alward has testified that Gee should have been transported to the hospital sooner and Rogers admits, in retrospect, that she should have handled things differently.[4]

## III. SUMMARY JUDGMENT STANDARD

Motions for summary judgment are governed by Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

---

[4] Interestingly, the consultation report from the hospital indicates that Gee was allergic to peanut butter and codeine, but Gee was given peanut butter sandwiches at the jail and Hydrocodone, a codeine analog. None of the experts, or parties for that matter, address whether these circumstances played any significant role in the events and treatment at issue.

show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Summary judgment is the "put up or shut up" moment in a lawsuit. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003), *reh'g denied*. Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials which "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 997 (7th Cir. 1996), *cert. denied*, 520 U.S. 1116 (1997). It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). When the moving party has met the standard of Rule 56, summary judgment is mandatory. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Shields Enters., Inc. v. First Chi. Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992).

In evaluating a motion for summary judgment, a court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996), *cert. denied*, 519 U.S. 1109 (1997). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of

12

the suit in light of the substantive law will preclude summary judgment.  *See Anderson*, 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co*., 94 F.3d 270, 273 (7th Cir. 1996).  Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute.  *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992).  "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party."  *Ortiz v. John O. Butler Co*., 94 F.3d 1121, 1124 (7th Cir. 1996), *cert. denied*, 519 U.S. 1115 (1997).

## IV. <u>DISCUSSION</u>

### A.  QUALIFIED IMMUNITY

The individual Jail and Medical Defendants contend that they are entitled to qualified immunity, which is an "'entitlement not to stand trial or face the other burdens of litigation.'" *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). The privilege is "'an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" *Id*. at 200-01 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) (emphasis in original).  As a result, the Supreme Court has stressed the importance of resolving immunity questions at the earliest stage of litigation.  *Id*. at 201.

In addressing the qualified immunity issue, a court's initial inquiry must be whether, taken in the light most favorable to the nonmovant (in this case, the Estate), the facts alleged show that Defendants' conduct violated a constitutional right.  *Saucier*, 533 U.S. at 201.  If a violation could be established on a favorable view of the facts, the next step is to ask whether the right was clearly

established.  This inquiry must be undertaken "in light of the specific context of the case, not as a broad general proposition."  *Id*.  In addition, the "relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Id*. at 202 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).  The absence of case law that is "precisely on all fours on the facts and law involved" does not mean that a defendant is entitled to qualified immunity.  *See Anderson v. Creighton,* 483 U.S. 636. 640 (1987); *Kernats v. O'Sullivan*, 35 F.3d 1171, 1176 (7th Cir. 1994) (citation omitted).  Rather, the Court must determine whether the unlawfulness of the conduct was readily apparent in light of pre-existing law. *See Anderson*, 483 U.S. at 640.  The Court must not make this determination too abstractly because "government employees must obey the law in force at the time but need not predict its evolution . . . ."  *Kernats,* 35 F.3d at 1176 ( quoting *Greenberg v. Kmetko*, 922 F.2d 382, 385 (7th Cir. 1991)).

As an initial matter, there is a question of whether the individual Medical Defendants are entitled to assert a defense of qualified immunity.  Evidence suggests that they were private contractors and not employees of the Monroe County Jail.  The Supreme Court has provided some guidance in the area with its decision in *Richardson v. McKnight*, 521 U.S. 399, 408-09 (1997), where it concluded that private prison guards were not entitled to use the defense of qualified immunity. However, the Supreme Court specifically indicated in *Richardson* that it was addressing the immunity question narrowly in the context in which it arose, emphasizing that the context did not "involve a private individual briefly associated with a government body, serving as an adjunct to government in an essential governmental activity, or acting under close official supervision." *Richardson*, 521 U.S. at 413.  Thus, it is clear that the Supreme Court has not shut the door on the

14

use of the defense by private individuals in all cases.  In fact, the Seventh Circuit has addressed the defense in other cases involving private individuals  *See e.g.*, *Malinowski v. DeLuca*, 177 F.3d 623, 627 (7th Cir. 1999) (concluding that immunity was unwarranted where facts revealed that private entities carried out their duties largely without government supervision or direction); *cf. Sherman v. Four County Counseling Ctr.*, 987 F.2d 397, 405-06 (7th Cir. 1993) (concluding that private hospital could raise the defense where it treated patient pursuant to court order).

Here, the individual Medical Defendants might be entitled to assert the defense of qualified immunity.  Pursuant to the agreement between the Sheriff and the Hospital, they were hired to assist the Sheriff in fulfilling the Sheriff's obligation to care for the detainees under the Sheriff's care. Therefore, the individual Medical Defendants might fit within the narrow exception to the general rule that qualified immunity is reserved for government officials.  However, the Court need not explicitly resolve this issue because, even assuming that the individual Medical Defendants are entitled to assert the defense, it would fail.  As explained more fully below, the Court concludes that the facts, when taken in the light most favorable to the Estate, suggest that Gee's constitutional right to receive adequate medical treatment was violated.  Consequently, any invocation by the individual Medical Defendants of the defense of qualified immunity would fail.

Similarly, with exception of Commander Wilson,  the individual Jail Defendants' assertion of the defense fails.  Like the individual Medical Defendants, the individual Jail Defendants cannot get over the hurdle that the facts, when taken in the light most favorably to the Estate, suggest that Gee's constitutional right to receive adequate medical treatment was violated.  As explained more fully below, the Estate has alleged a viable claim of deliberate indifference to medical needs and

15

there are factual disputes that must be resolved by a jury, which precludes the granting of summary judgment.

As for Commander Wilson, he is entitled to qualified immunity because there is no basis for liability against him. For one, he had no personal involvement with Gee's treatment. Indeed, he contends that he was unaware that Gee was even being held or that Gee was ill. The Estate nonetheless argues that Commander Wilson had knowledge of Gee's condition because Ms. Gee and Turpin contacted Commander Wilson about that information. It is unclear that either Ms. Gee or Turpin actually spoke directly with Commander Wilson. But even if they did, Commander Wilson has stated that he would have contacted the medical staff to inquire about the matter and requested medical treatment. It is well-established that a jail officer is entitled to defer to the judgment of a medical professional with regard to the appropriate way to treat an inmate. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) (citing *Durmer v. O'Carroll*, 991 F.2d 64 (3d Cir. 1993), and *Johnson v. Doughty*, 433 F.3d 1001, 1011 (7th Cir. 2006)). Therefore, under the circumstances, the Court concludes that the Estate cannot demonstrate the Commander Wilson violated Gee's constitutional right to receive adequate medical care. As such, Commander Wilson is entitled to qualified immunity.

## B.  DELIBERATE INDIFFERENCE TO MEDICAL CARE

In order to prevail on its § 1983 claim denial of deliberate indifference to medical care, the Estate must prove "deliberate indifference to [Gee's] serious medical needs." *Estelle v. Gamble*, 429

U.S. 97, 106 (1976).[5]  "Deliberate indifference" means the "unnecessary and wanton infliction of pain."  *Id.* at 104 (citing *Gregg v. Georgia*, 428 U.S. 153, 157 (1976)).  The test for considering such claims contains both an objective and subjective element.  *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  In order to satisfy the objective component, "the deprivation must be, objectively, 'sufficiently serious.'" *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).  A prison official's actions must result in the denial of "'the minimal civilized measure of life's necessities.'"  *Id.* (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).  The subjective component requires a showing that the prison official knew of a substantial risk of serious injury to the prisoner but nevertheless failed to take reasonable measures to prevent harm from occurring.  *See Henderson v. Sheahan*, 196 F.3d 839, 845 (7th Cir. 1999).  In addition, "[t]he officials must know of and disregard an excessive risk to inmate health; indeed they must 'both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists' and 'must also draw the inference.'"  *Greeno v. Daley*, 414 F.3rd 645, 653 (7th Cir. 2005) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

Notwithstanding the foregoing, neither medical malpractice nor differences in opinion over medical judgment on appropriate treatment amounts to deliberate indifference.  *See Estelle*, 429 U.S. at 106-07.  In fact, "[t]o infer deliberate indifference on the basis of physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it

---

[5] Technically, because he was not a prisoner but a pretrial detainee, Gee was protected under the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535 n. 16 (1979)).  However, in determining whether Gee's rights were violated, the analysis is identical to that applied under the Eighth Amendment.  *See, e.g.*, *Barrie v. Grand County*, 119 F.3d 862, 868 (10th Cir. 1997); *Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996).

was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir.

2006).  Moreover, as previously noted, a jail officer is entitled to defer to the judgment of a medical

professional with regard to the appropriate way to treat an inmate.  *See Burks*, 555 F.3d at 595.

Nonetheless, a plaintiff can still establish deliberate indifference "by inference from circumstantial

evidence, including evidence that the risk was so obvious that a jury may reasonably infer actual

knowledge on the part of the defendants." *Vinning-El v. Long*, 482 F.3d 923, 924-25 (7th Cir. 2007)

(citations omitted).

Here, with respect to Captain Johnson and Sergeant Edwards, the Estate essentially argues

that this case falls under an exception to the general rule because it is one of the "unusual case[s]

where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate

treatment" and therefore it is unreasonable for prison officials to "rely on the judgment of medical

professionals." *Johnson*, 433 F.3d at 1010 (quoting from *Bond v. Aguinaldo*, 228 F. Supp. 2d 918,

920 (N.D. Ill. 2002)).  The Court agrees that there is evidence that, if believed by a jury, suggests

that Captain Johnson and Sergeant Edwards were confronted with a  case of an inmate who was

obviously suffering from an ailment that required immediate treatment.  Specifically, various

laypersons that included Estanislau, Turpin, and Ms. Gee allegedly recognized that Gee needed

immediate medical care beyond what was being administered at the jail and expressed their concern

to jail and medical staff.[6]  If these laypersons reached their conclusions based on their observations

of Gee, it is at least conceivable that the jail staff should have recognized the potential need for

immediate care by the hospital.  There is no question that they had the authority to override the

---

[6] By March 30, 2005, even Estes recognized that possibility, although a later
consultation with Rogers convinced her otherwise.

18

nursing staff's recommendations and request that Gee be transferred to the hospital if Gee was facing a serious medical issue.  Thus, if the Estate's witnesses are believed, a jury could find that Captain Johnson and Sergeant Edwards turned a blind eye to Gee's condition and improperly deferred to the medical staff.  Therefore, the Court concludes that summary judgment cannot be granted in favor of Captain Johnson and Sergeant Edwards.

Furthermore, if it was obvious to a layperson that Gee needed more serious medical attention, then it should have been even more clear to a trained medical professional.  Gee's medical records might be said to paint an alarming picture of an inmate with fluctuating and unstable blood sugar levels whose health was rapidly declining in the jail.  In addition, Gee's subjective complaints of intense pain, coupled with the fact that he was a severe diabetic who was not eating or properly hydrating, arguably should have raised more concern than it did.  All of the Estate's tendered experts agree that more should have been done, and their opinions are supported at least in part by Dr. Alward and Rogers own retrospective comments.  Therefore, the Court cannot enter summary judgment in favor of the Medical Defendants.

## C.  THE SHERIFF'S POTENTIAL LIABILITY

In addition to Captain Johnson and Sergeant Edwards, the Estate seeks to recover from the Sheriff for Gee's death.  The Amended Complaint appears to raise several, somewhat conflicting rationales for imposing liability against the Sheriff.  For instance, the Estate claims that the medical policies were deficient while at the same time arguing that the absence of a specific policy or policies led to Gee's death.  The Amended Complaint also generally raises a failure to train theory. However, based on the Estate's response to the Jail Defendants' motion and the statements of the

experts upon whom the Estate relies in opposition for the official liability issue, it appears that the Estate's claim boils down to allegations that the Sheriff failed to have a better policy that specifically addressed how officers were to monitor the medical needs of inmates in segregation, and that the Sheriff failed to provide better training on recognizing and responding to emergency or life threatening ailments.

The Estate's official capacity claim against the Sheriff is treated as a claim against Monroe County itself. *See Grieveson v. Anderson*, 538 F.3d 763, 771 (7th Cir. 2008). Counties and other governmental entities may not be held liable for the unconstitutional acts under a *respondeat superior* theory, but rather are liable for those acts only if they were carried out pursuant to an official custom or policy. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007). In order to prevail on its claim against the Sheriff, the Estate must prove that: (1) Gee suffered a deprivation of a federal right (2) as a result of either an express municipal policy, widespread custom, or deliberate act of a decision-maker with final policy-making authority (3) which was the proximate cause of Gee's death. *See Monell*, 436 U.S. at 690-91; *Frake v. City of Chicago*, 210 F.3d 779, 781 (7th Cir. 2000).

In addition, the Estate can only prevail on its failure to train theory if the failure to train amounted to "deliberate indifference" to Gee's rights. *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989). The Estate is required to demonstrate that the Sheriff had actual or constructive knowledge that such a failure to train would likely result in constitutional deprivations. *See Robles v. City of Fort Wayne*, 113 F.3d 732, 735 (7th Cir. 1997). This could be accomplished by presenting evidence of a pattern of constitutional violations, or where a clear constitutional duty is implicated in recurrent situations that officers are likely to face. *See id.* Thus, the following test is useful in

20

making that showing: (1) the training provided to jail officers was, in fact, inadequate; (2) the Sheriff is culpable because there was an obvious need for training and he consciously chose not to provide adequate training; and (3) the Sheriff's choice not to provide adequate training was the "moving force" behind the alleged constitutional deprivations. *See Grieveson*, 538 F.3d at 771; *Kindle v. City of Harvey*, No. 00 C 6886, 2002 WL 230779, *3 (N.D. Ill. Feb. 15, 2002) (citing *Monell*, 436 U.S. at 694).

The Jail Defendants present multiple arguments explaining why the Sheriff is entitled to summary judgment. Their first contention can be easily dispensed. The Jail Defendants argue that there can be no official liability because none of the individual jail officers committed a constitutional violation. Because the Court has concluded that there are disputed issues of fact on that point, the argument is unpersuasive.

The Jail Defendants' remaining argument is more compelling. They argue that even if there was a constitutional violation, the office of the Sheriff cannot be liable because there is no unconstitutional policy, custom, or practice and no evidence of any deliberate indifference to training needs. They note that the Sheriff's medical policy is not unconstitutional because it does not encourage deliberate indifference to medical needs but indicates that treatment should be provided and that inmates facing emergency or life threatening ailments should be transported to the hospital. Further, the Jail Defendants contend that there is no evidence of any widespread practice or custom of tolerating or condoning deliberate indifference to an inmate's medical needs and no evidence of prior incidents of constitutional deprivations that would have placed the Sheriff on notice of the need for additional training. Finally, the Jail Defendants note that training was provided and that the Estate is really pressing a case for better or more specialized training,

21

allegations which do not provide the basis for official liability.  *See, e.g.*, *Palmquist v. Selvik*, 111 F.3d 1332, 1345 (7th Cir. 1997); *Estate of Perry v. Boone County Sheriff*, No. 1:05-cv-1153, 2008 WL 694696, *13-14 (S.D. Ind. March 12, 2008).

The Court agrees with the Jail Defendants that the Sheriff is entitled to summary judgment. The undisputed evidence shows that all jail officers hired by the Sheriff were required to take the training course offered by the Indiana Law Enforcement Academy.  In addition, all officers were required to complete in-house training and an orientation program that included on-the-job training and instruction on medical considerations for inmates.  These facts negate any inference that the Sheriff was deliberately indifferent to training needs.  *See, e.g.*, *Tapia v. City of Greenwood*, 965 F.2d 336, 339 (7th Cir. 1992) (noting that SWAT team's unconstitutional entry into home could not be said to have been done pursuant to official policy where officers attended training academies and had training on warrants).

Moreover, prior to Gee's death, there is no evidence that any inmate had died or sustained serious injury from a failure to secure proper medical attention, including complications from diabetes or pneumonia.  In that respect, this case is similar to the circumstances in *Hirsch v. Burke*, 40 F.3d 900 (7th Cir. 1994), where a diabetic died from insulin shock.  In *Hirsch*, because there was no evidence that the defendants were on notice of any pattern of similar violations resulting from inadequate training, the Seventh Circuit found that plaintiff's failure to train theory failed.  *See id.* at 904-05.  The Seventh Circuit concluded that, at most, the case was one of simple negligence, which is insufficient to establish a § 1983 claim.  *See id.* at 905.  *See also Palmquist v. Selvik*, 111 F.3d 1332, 1345 (7th Cir. 1997) (rejecting argument that specialized training was necessary because it is contrary to "better or more" training scenarios that are insufficient to establish a failure to train

22

theory).  Although the Court is not putting its imprimatur on the Sheriff's policies or training procedures, the Court concludes that the circumstances are similar to the facts and circumstances of those cases that have concluded that there is no official liability.  Therefore, the Court finds that the Sheriff is entitled to summary judgment.

### D.  STATE LAW CLAIMS

In addition to the federal claims under § 1983, the Jail Defendants have moved for summary judgment on the Estate's state law claims.  The Jail Defendants first argue that the state law claims against the individual officers should be dismissed pursuant to Indiana Code § 34-13-3-5(b), which bars claims against government employee who have acted within the scope of their employment.[7] There is no dispute that the jail officers were acting within the scope of their employment at all relevant times.

The Jail Defendants next argue that the Sheriff cannot be liable on any state law claim of negligence because he discharged his duty under Indiana Codee § 36-2-13-5(a)(7) to provide access to medical care.  The Jail Defendants argue that, because medical care was provided, the Estate must show that the Sheriff knew that the medical staff had a reputation for not providing appropriate medical care or misdiagnosing ailments.  *See Trout v. Buie*, 653 N.E.2d 1002, 1008 (Ind. Ct. App. 1995).  The Jail Defendants contend that there is no evidence demonstrating that the medical staff

---

[7] An exception to this general grant of immunity is the use of excessive force.  *See Kemezy v. Peters*, 622 N.E.2d 1296, 1297 (Ind. 1993).  Although the Amended Complaint includes references to "excessive force," there are no factual circumstances in the case suggesting that such a claim is warranted.  Therefore, even if the Estate is asserting such a claim, the record before the Court demonstrates that the Jail Defendants would be entitled to summary judgment on that claim.

had a history or reputation of failing to provide appropriate treatment or incorrectly diagnosing ailments or that the Sheriff breached the duty to provide access to medical care.

Finally, the Jail Defendants argue that the Sheriff cannot be held vicariously liable for any potential medical malpractice that might have been committed by the medical staff.  They assert that the Sheriff is immune from such liability pursuant to Indiana Code § 34-13-3-3(10), which shields a governmental entity from liability for acts committed by anyone other than the governmental employee or its employees.  The Jail Defendants point out that this protection extends to non-delegable duties that the governmental entity has contracted out to a private party where there is no showing that the governmental entity negligently supervised a negligent independent contractor. *See  City of Vincennes v. Reuhl*, 672 N.E.2d 496 (Ind Ct. App. 1996); *Shand Mining Co. v. Clay County Bd. of Comm'rs*, 671 N.E.2d 477 (Ind. Ct. App. 1996).  *But see Hinshaw v. Bd. of Comm'rs of Jay County*, 611 N.E.2d 637 (Ind. 1993) (providing that immunity applies to situation where vicarious liability might be imposed for conduct of agents who are not employees or subject to ay right of control).  The Jail Defendants argue that there is no basis for concluding that the Sheriff negligently supervised the medical staff.

The Estate has failed to respond to any of these arguments.  Therefore, the Court deems that the state law claims against the Jail Defendants have been abandoned.  Moreover, the Court finds that there is a legal basis supporting each of the Jail Defendants' arguments.  Accordingly, the Court concludes that the Jail Defendants are entitled to summary judgment on the state law claims.

## V. <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's motion for oral argument (Docket No. 165) is **DENIED**.

The motion is strike the evidence submitted with Plaintiff's surreply (Docket No. 201) is **GRANTED**.  In addition, the Defendants' requests in their reply briefs to strike portions of Plaintiffs' experts' opinions are **GRANTED in part and DENIED in part**.

The Jail Defendants' motion for summary judgment (Docket No. 129) is **GRANTED in part and DENIED in part**.  All claims against the Monroe County Sheriff and Jail Commander Bill Wilson are **DISMISSED with prejudice** and their names may be removed from the caption as defendants in this case.  In addition, all state law claims against the Jail Defendants are **DISMISSED with prejudice**.  Only Plaintiff's claims arising under 42 U.S.C. §§ 1983 and 1988 remain pending against Captain Johnson and Sergeant Edwards.

The Medical Defendants' motion for summary judgment (Docket No. 135) is **DENIED**.

Finally, the Clerk is **DIRECTED** to remove Vera Gee from the caption and as a party in the case.  Thomas Beeman is **SUBSTITUTED** for Vera Gee as the Special Administrator of the Estate.

IT IS SO ORDERED: 03/31/2009

_William T. Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Distribution attached.

25

**Electronically distributed to:**

Rosemary L. Borek
STEPHENSON MOROW & SEMLER
rborek@stephlaw.com

Lara Kathleen Cutshall
BUNGER & ROBERTSON
lcutshall@lawbr.com

Sean W. Drew
DREW LAW OFFICE
drewlaw@qtm.net

Geoffrey Nels Fieger
FIEGER FIEGER KENNEY & JOHNSON
info@fiegerlaw.com

Judith Elaine Golitko
GOLITKO LEGAL GROUP
jg@golitkolegal.com

Matthew M. Golitko
GOLITKO LEGAL GROUP P.C.
mg@golitkolegal.com

Mary Anne Pelic
BUNGER & ROBERTSON
mpelic@lawbr.com

Ronald J. Semler
STEPHENSON MOROW & SEMLER
rsemler@stephlaw.com

James S. Stephenson
STEPHENSON MOROW & SEMLER
jstephenson@stephlaw.com

Richard A. Waples
WAPLES & HANGER
richwaples@aol.com

James L. Whitlatch
BUNGER & ROBERTSON
jwhit@lawbr.com